### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

DAISUKE ENOMOTO,

       Plaintiff,

vs.

       Civil Action No. 1:08CV861 - Jcc/TCB

SPACE ADVENTURES, LTD.

       Defendant.

## COMPLAINT

Plaintiff Daisuke Enomoto ("Mr. Enomoto" or "Plaintiff"), by his attorneys Willcox & Savage, P.C., and White & Case LLP, for his Complaint against Defendant Space Adventures, Ltd. ("Space Adventures" or "Defendant" or "SA") alleges, on personal knowledge as to his actions and upon information and belief as to the actions of others, as follows:

## NATURE OF THIS ACTION

1.     This action arises out of a contract for private citizen space flight under which Plaintiff Daisuke Enomoto paid $21,000,000 but received no space flight in return.

2.     The $21,000,000 sum is the aggregate of four milestone payments that Defendant Space Adventures deceptively and fraudulently induced Mr. Enomoto to make over a twenty-one month period.

3.     The first of the milestone payments was a $2,000,000 down payment. Before any other payments were made, Mr. Enomoto informed Space Adventures that if he could not participate in a spacewalk, termed "extra-vehicular activities" ("EVA"), while in space, he might

not proceed with a space flight at all.

4.	Eager to appease Mr. Enomoto and collect the additional $18,000,000 remaining on the contract, Space Adventures told Mr. Enomoto what he wanted to hear: that he would be able to do an EVA. By this representation, upon information and belief, Space Adventures believes an oral contract was formed. Space Adventures, however, was never in a position to make that promise, as it had no authority to do so. When Mr. Enomoto finally realized that Space Adventures could not deliver an EVA, Space Adventures's earlier representation that it could had already induced Mr. Enomoto to part with $21,000,000.

5.	The written contract governing the space flight called for $20,000,000 to be paid by Mr. Enomoto, but even after extracting $21,000,000 from him, Space Adventures pressured Mr. Enomoto to pay more. When it became clear that Mr. Enomoto would not make additional payments, he was disqualified from the space flight under the pretense of "negative changes in [Mr. Enomoto's] health condition."

6.	The "health condition" for which Mr. Enomoto was disqualified was known to Space Adventures from the outset of its relationship with Mr. Enomoto and confirmed several times, but Space Adventures never advised Mr. Enomoto of its disqualifying nature. Instead, Space Adventures represented to Mr. Enomoto that the condition posed no threat to his candidacy for space flight, and collected a series of multi-million dollar payments from him.

7.	In addition, Mr. Enomoto's "medical condition" was no worse than it was just two weeks prior to his disqualification, when he was medically cleared by the Russian Government Medical Commission (the "GMK") - nor was his condition worse than it was approximately seven weeks before disqualification, when he was medically cleared by the MSMB, a group of

five physicians charged with approving all private citizen travel to the International Space Station ("ISS"), composed of one physician from each ISS partner agency, including the Russian Federal Space Agency ("RFSA") - the agency administering the flight - and the National Aeronautics and Space Administration ("NASA").

8.     Space Adventures has refused to refund any portion of the $21,000,000 that Mr. Enomoto paid to Space Adventures, despite its contractual obligation to do so and multiple attempts by Mr. Enomoto to recover the payments.

9.     Under the law of this Commonwealth, the acts and omissions of Space Adventures constitute breach of a written contract, breach of the implied covenant of good faith and fair dealing, actual fraud, fraud in the inducement of performance, conversion, violation of the Virginia Consumer Protection Act of 1977 ("VCPA"), and breach of an alleged oral contract or, in the alternative, unjust enrichment.

10.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to an award for his actual and statutory damages, punitive damages, attorneys' fees, and the costs of bringing this action.

## THE PARTIES

11.     Plaintiff Daisuke Enomoto is a Japanese citizen, having a residence in Japan.

12.     Upon information and belief, Defendant Space Adventures, Ltd. is a corporation organized and existing under the laws of the State of Nevada, having a place of business at 8000 Towers Crescent Drive, Suite 1000, Vienna, Virginia 22182.

## JURISDICTION AND VENUE

13.     This court has subject matter jurisdiction over this action, under 28 U.S.C.

§1332(a), in that:

     a.  Plaintiff is an individual citizen of Japan;

     b.  Upon information and belief, Defendant is a citizen, pursuant to 28 U.S.C. §1332(c)(1), of the Commonwealth of Virginia;

     c.  There is complete diversity of citizenship between Plaintiff and Defendant; and

     d.  The amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

14.     Venue is proper in this district and Division, pursuant to 28 U.S.C. §1391(a) and

Local Rule 3(c), in that the Defendant is a corporation that is located and has its principal place

of business within the Eastern District of Virginia, Alexandria Division, and regularly conducts

business within this judicial District and Division. The acts and conduct complained of herein

occurred in substantial part in this judicial District and Division.

15.     This Court has personal jurisdiction over Defendant, pursuant to 28 U.S.C.

§1391(c). Additionally, this Court also has personal jurisdiction over the Defendant in that

Defendant consented to jurisdiction by contract:

     a.  This Agreement shall, in all respects (including its existence, validity, interpretation, implementation, termination and enforcement) be governed by the laws of the Commonwealth of Virginia . . . Any legal action arising out of this Agreement shall be adjudicated in courts located in the Commonwealth of

Virginia . . . and neither party shall contest jurisdiction or venue in such courts. Agreement §8.09.

## GENERAL ALLEGATIONS

16.　On November 3, 2004, Mr. Enomoto and Space Adventures (collectively the "Parties") entered into the "Orbital Space Flight Purchase Agreement" (the "Agreement"), a written contract under which Space Adventures promised to facilitate Mr. Enomoto's participation in an orbital space flight (the "Space Flight") with RFSA.

17.　Upon information and belief, prior to executing the Agreement, Space Adventures purchased from RFSA the rights to four seats (the "Seats"), reserved for private citizens, aboard future RFSA flights to the ISS.

18.　Upon information and belief, prior to executing the Agreement, Space Adventures had sold two of the Seats.

19.　Upon information and belief, by entering into the Agreement, Space Adventures purported to commit the third of the Seats to Mr. Enomoto. Upon information at the time it entered into the Agreement, Space Adventures's rights in the Seats were limited, such that they extended only so far as to permit Space Adventures to offer a seat to an individual, subject to the approval of, and formal agreement with, RFSA. Upon information and belief, Space Adventures's rights in the Seats at the time the Agreement was executed did not include the rights to unequivocally pledge a space flight as consideration in any agreement with any private citizen.

20.　Nonetheless, the terms of the Agreement obligated Space Adventures to "provide the Client with an orbital space flight aboard a Soyuz-FG rocket and Soyuz-TMA spacecraft to

the ISS (the 'Space Flight'), all associated, prudent, and required training prior to such Space Flight (the 'Space Flight Training'), as well as a health examination and post-flight program that occurs after the completion of the Space Flight." *Id.* §3.01.

21.     The Agreement specified that "SA shall provide the Space Flight Experience within the framework of the Russian Federal Space Program and the ISS program, and shall be responsible for the organization of the Space Flight Experience with the ISS management boards and in accordance with the ISS procedures and administrative policies." *Id.* §3.01.01.

22.     Space Adventures's performance under the Agreement depended on its ability to offer a Space Flight through RFSA. Space Adventures represented that it had "full capacity and authority to enter into [the] Agreement." *Id.* §8.01.01.

23.     The Agreement also stated that "SA has reserved and owns sole and exclusive rights to provide four Space Flight Experiences." *Id.* Article 1.

24.     In exchange for Space Adventures's promise to provide the Space Flight, the Agreement obligated Mr. Enomoto to pay $20,000,000 "for the Space Flight Experience." *Id.* §5.01.

25.     Mr. Enomoto agreed to pay a non-refundable $2,000,000 deposit upon execution of the Agreement. *Id.* §5.02.01.

26.     The Parties agreed that Mr. Enomoto could terminate the Agreement upon written notice, "without further obligation," if Space Adventures failed to provide Mr. Enomoto with the "Space Flight Experience by December 31, 2007 due to SA's or RFSA's non-performance or material default." *Id.* §7.03.02.

27. The Agreement also mandated that, in the event that Mr. Enomoto terminated the Agreement pursuant to §7.03.02, Mr. Enomoto would "receive a full refund of all payments not already transferred to the Russian parties, with the exception of the Contract Deposit." *Id.*

28. Mr. Enomoto performed his obligations under the Agreement. Between the execution date of the Agreement, November 3, 2004, and the date that Mr. Enomoto received notice of his disqualification from the Space Flight, August 22, 2006, nearly two years later, Mr. Enomoto followed all medical recommendations, participated in all the required training, and made payments to Space Adventures totaling $21,000,000.

29. On November 12, 2004, Mr. Enomoto paid the non-refundable $2,000,000 contract deposit to Space Adventures pursuant to §5.02.01 of the Agreement.

30. Between November 29 and December 1, 2004, Mr. Enomoto underwent a medical prescreen in Houston, Texas, administered by a NASA physician who, upon information and belief, was working under a contract with Space Adventures.

31. That Space Adventures doctor reviewed Mr. Enomoto's medical history, including episodes of passing four to five kidney stones during the three years prior to his prescreen, as well as bleeding hemorrhoids.

32. The Space Adventures doctor further observed several then-current medical conditions, including kidney stones, hemorrhoids, and a soft tissue mass on the base of Mr. Enomoto's neck during the prescreen.

33. With respect to Mr. Enomoto's kidney stones, the Space Adventures doctor stated: "For spaceflight, Mr. [Enomoto's] kidney stones present two problems. The current

stones need to be successfully treated since nephrolithiasis could result in interruption to training or an incapacitating event during spaceflight. In addition, Mr. [Enomoto] is metabolically prone to develop kidney stones and intervention is necessary to reduce that risk during the training flow and spaceflight."

34.     The Space Adventures doctor recommended treatment of the kidney stones and documentation of Mr. Enomoto's "stone free status" three to four months prior to his Space Flight.

35.     According to ISS medical standards in place at the time of the medical prescreen in November-December 2004, Mr. Enomoto's medical conditions, primarily the presence of multiple kidney stones, precluded his certification for space flight.

36.     Upon information and belief, in or about December 2004, Defendant knew or should have known that under ISS medical standards, Mr. Enomoto's medical condition disqualified him from participation in the Space Flight.

37.     On December 1, 2004, Space Adventures President and CEO Eric Anderson ("Mr. Anderson") identified Mr. Enomoto as an investor to Space Adventures's shareholders in New York, New York.

38.     In late 2004, Space Adventures hired a physician, then the head physician at Ayase Station Kidney Clinic in Japan, to act as a consultant and as Mr. Enomoto's flight surgeon throughout the space flight qualification process.

39.     On or about January 15, 2005, Space Adventures Director of Programs Akane McCarthy ("Ms. McCarthy") informed Mr. Enomoto that she had been negotiating to delay Mr.

Enomoto's medical evaluation in Moscow and had "obtained a postponement of two weeks so that you will move to Moscow in your best shape."

40.     Pursuant to a recommendation by a urological expert, Dr. Kohri, Mr. Enomoto received lithotripsy therapy at Nagoya City Medical College in Japan on or about January 18-20, 2005, in an attempt to treat his kidney stones. A renal CT scan allegedly revealed three kidney stones, the largest of which was allegedly 3.5 x 1 mm, and which was allegedly broken up through the lithotripsy to be smaller than 1 mm. The other stones were all allegedly found to be smaller than 1 mm.

41.     According to ISS medical standards in place at the time of the January 2005 renal CT scan, the presence of kidney stones in a candidate precluded certification for space flight.

42.     Upon information and belief, Space Adventures knew or should have known following the January 2005 CT scan that ISS medical standards precluded Mr. Enomoto's participation in the Space Flight.

43.     Between February and April of 2005, pursuant to his obligations under the Agreement, Mr. Enomoto underwent additional rounds of medical testing in Moscow, Tokyo and London.

44.     Between February 14 and 25, 2005, Mr. Enomoto was examined at the Gagarin Cosmonaut Training Centre ("GCTC") in Moscow, during which a brain CT and MRI revealed that Mr. Enomoto had a cavernous hemangioma.

45.     According to ISS medical standards in place at the time of the February 2005 CT scan, the presence of a cavernous hemangioma precluded certification for space flight.

46.     Upon information and belief, Space Adventures knew or should have known following the February 2005 MRI and CT scan that, under ISS medical standards, Mr. Enomoto's medical condition disqualified him from participation in space flight.

47.     On or around February/March 2005, Mr. Enomoto and Space Adventures began discussing the possibility of Mr. Enomoto participating in EVA during his Space Flight.

48.     On March 2, 2005, Ms. McCarthy informed Mr. Enomoto that Mr. Anderson had recently proposed a Suborbital Space Flight investment project to a Sheik in Dubai and wanted to discuss the potential investment with Mr. Enomoto.

49.     Mr. Enomoto replied to Ms. McCarthy's March 2 communication that "the possibility of taking actions for investing on my side at this point is difficult, because we will probably execute an acquisition of a listing company in Hong Kong . . . and then we will consider investment. I would expect that the investment would come much later."

50.     Despite Mr. Enomoto's reluctance to discuss an investment at the time, Ms. McCarthy responded to Mr. Enomoto's communication regarding the investment and informed him that Mr. Anderson still intended to call him that afternoon to discuss the project.

51.     On March 13, 2005, a Russian medical team consisting of one, Dr. Bogomolov, and one, Dr. Morgun, met to discuss the risks of Mr. Enomoto's brain hemangioma and kidney stones in respect of his candidacy for the Space Flight.

52.     The collective opinion of Drs. Bogomolov and Morgun was that the risks posed by Mr. Enomoto's condition were significant with respect to his eligibility for space flight. The

doctors' opinion was consistent with ISS medical standards in place on March 13, 2005, which standards in fact precluded Mr. Enomoto's participation in the Space Flight.

53.     On March 14, 2005, the Russian medical team meeting continued, with Drs. Bogomolov, Morgun, and one, Dr. Pool in attendance. The doctors suggested that Mr. Enomoto receive an MRI following exposure to centrifuge acceleration in order to evaluate Mr. Enomoto's risk of hemorrhage and convulsion. At this time, Dr. Pool also recommended that Mr. Enomoto's kidney stone risk be discussed by the MSMB.

54.     Upon information and belief, all of Drs. Bogomolov, Morgun, and Pool, as well as Space Adventures, knew or should have known that subjecting Mr. Enomoto to a centrifuge in the presence of a hemangioma posed an extreme risk to Mr. Enomoto's health and could have been fatal.

55.     On or around March 29, 2005, Ms. McCarthy e-mailed Mr. Enomoto with the schedule for planned medical tests in London. Ms. McCarthy revealed that Space Adventures was worried about the Russian side "chang[ing] their mind" if there was a delay in Mr. Enomoto's trip to London.

56.     On April 1, 2005, pursuant to the Russian medical team's recommendation, Mr. Enomoto received an altitude chamber test at the Japanese Space Exploration Agency ("JAXA"), which allegedly showed no abnormalities.

57.     Also pursuant to the Russian medical team's recommendation, in early April, Mr. Enomoto received a centrifuge acceleration test, followed immediately by an MRI, in England, which allegedly showed no brain abnormality.

58.     Ms. McCarthy suggested to Mr. Enomoto on April 20, 2005, that in order to "enhance the value" of the news of Mr. Enomoto's trip to space for a press conference, Mr. Enomoto should create a bigger reaction to his space flight announcement by making additional public commitments to Space Adventures. Specifically, Space Adventures attempted to persuade Mr. Enomoto to further endorse the company by proposing that he announce that he was "planning to make investments on space business going forward (such as suborbital [space flight])."

59.     While attempting to convince Mr. Enomoto to publicly announce future financial commitments to Space Adventures, Ms. McCarthy simultaneously acknowledged that RFSA had complete discretion over whether Mr. Enomoto would participate in EVA by stating that Space Adventures could not announce the plan to do EVA "until the Russian side confirms."

60.     Mr. Enomoto replied to Ms. McCarthy's e-mail on April 21, 2005, and commented: "To tell you the truth, if I can't do EVA, I am thinking of not going to space."

61.     Upon information and belief, no private citizen had ever participated in EVA prior to it being offered by Space Adventures to Mr. Enomoto.

62.     Despite the unprecedented nature of his request to be the first private EVA participant, Space Adventures quickly confirmed that RFSA had approved Mr. Enomoto's EVA participation. On May 17, 2005, Mr. Anderson told Mr. Enomoto that "The Russians have completed the details of the EVA project and it is possible, it will cost about $10M extra as I told you."

63.     Upon information and belief, RFSA in fact never approved the provision of EVA to Mr. Enomoto.

64.     Mr. Anderson informed Mr. Enomoto, also in his May 17 communication, that Space Adventures had drafted an Addendum to the Agreement ("Addendum I") to account for the EVA program.

65.     Despite this being the first time that Space Adventures had ever offered EVA to a civilian, Mr. Anderson assured Mr. Enomoto on May 17, 2005 that it would "not be a complicated Addendum," and stated that the parties "should try to finish it as soon as possible, before [Mr. Enomoto's evaluation by the Russian Government Medical Commission,] the GMK."

66.     Upon information and belief, the GMK is the medical review board for RFSA, which evaluates the medical condition of planned space flight participants and determines whether they are medically fit for space flight.

67.     On May 17, 2005, Mr. Anderson continued to pursue Mr. Enomoto as an investor, stating: "the development investment plan I told you about on the phone two weeks ago is finished and has been completely approved by my board of directors. How shall I send it to you? I will most likely be in Moscow around the time of your GMK so we can answer any questions you might have or go through everything for suborbital then also."

68.     Space Adventures presented its draft of Addendum I to Mr. Enomoto on May 21, 2005, which provided that "The Space Flight shall include, at the complete discretion of the Russian parties, extra-vehicular activities ('EVA') at the ISS." Addendum I §3.01.

69.     Addendum I also stated that "should EVA not be provided, Ten Million US Dollars (US $10,000,000) [or whatever portion thereof, if any, has been paid by the Client and not already transferred to the Russian Parties] shall be refunded to the Client." *Id.* §5.03.

70.     Although Addendum I was never signed, Space Adventures nonetheless began to pressure Mr. Enomoto into making payments for EVA without any written contract requiring him to do so.

71.     On May 28, 2005, Mr. Enomoto informed NASA and JAXA of his intent to participate in EVA during his Space Flight.

72.     On May 30, 2005, Mr. Anderson assured Mr. Enomoto that he was making great progress towards qualifying for his Space Flight and participating in EVA, stating "the GMK neurology section had a meeting today regarding your GMK and the news is quite good, but they have decided that they still want you to do one more test in Japan before coming over for the GMK. After this test is complete, you will come over to Moscow and obtain GMK approval . . . . . The main reason they have decided to do this is because of the extra training and fitness required by the EVA . . . this is really good news, everyone is on board."

73.     On June 8, 2005, Ms. McCarthy e-mailed Mr. Enomoto regarding attending a Space Summit, a promotional event benefitting Space Adventures and costing $2500 per person, which was allegedly organized to discuss "the future of commercial space industries."

74.     The Space Summit was hosted by the family of Anousheh Ansari, whom Space Adventures would, the following year, offer the position of alternate space flight participant in the event Mr. Enomoto ultimately could not participate in the Space Flight.

14

75.     Mr. Enomoto and Ms. Ansari were first introduced during the Space Summit, and Ms. Ansari would, the following year, train alongside Mr. Enomoto in preparation for his Space Flight.

76.     The GMK evaluated Mr. Enomoto's medical condition in Moscow on or around June 30, 2005, and subsequently approved Mr. Enomoto as an intended Space Flight Participant on July 1, 2005.

77.     The GMK approval on July 1, 2005 was contrary to ISS medical standards in place at that time.

78.     Upon information and belief, both the GMK and Space Adventures knew or should have known that certain of Mr. Enomoto's medical conditions existing as of July 1, 2005, including the presence of multiple kidney stones, precluded his certification for Space Flight under ISS medical standards in place at that time.

79.     On July 1, 2005, the GMK recommended additional urological tests, including another renal CT scan, as well as lithotripsy therapy for Mr. Enomoto's kidney stones and chronic urinary tract infection. The GMK also recommended the removal of Mr. Enomoto's neck tumor.

80.     On July 13, 2005, by e-mail, Mr. Anderson sent Mr. Enomoto a "Recap" of topics the two had allegedly discussed earlier in the day. Mr. Anderson claimed that Mr. Enomoto had expressed his desire to participate in EVA but also wanted to explore options for extending the EVA or participating in multiple EVA's during his flight. Mr. Anderson also stated that the Parties had allegedly agreed that Space Adventures would order a "phase two study" on the EVA

topic after Mr. Enomoto submitted his next payment. Mr. Anderson added that, after receiving the results of this study, Mr. Enomoto could "decide how [he] want[ed] to proceed."

81.     Mr. Anderson also addressed the possibility of Mr. Enomoto investing in Space Adventures in his July 13 e-mail, alleging that "You [Enomoto] still want to invest money and become a partner in Space Adventures. We will discuss details over the next few weeks."

82.     Following the GMK's approval, on July 19, 2005, Space Adventures billed Mr. Enomoto for the second payment under the Agreement, $6,000,000 (the "Second Payment"), which was required to be made, pursuant to §5.02.02 of the Agreement, when Mr. Enomoto was selected for a specific mission.

83.     On or around July 20, 2005, Aleksey Krasnov, Chief of the Manned Spaceflight Department of RFSA ("Mr. Krasnov"), sent an "Intent for flight letter" to Mr. Anderson confirming the "positive decision of the State Medical Commission (GMK), which was held on July 1, 2005, concerning health (sic) condition of Mr. Enomoto under the results of his medical examinations." Mr. Krasnov's letter also confirmed that "Roscosmos plans Mr. Enomoto (sic) as the Space Flight Participant (SFP) candidate for a space flight to the ISS in 2006."

84.     Mr. Krasnov's letter also revealed that, to that point, Space Adventures and RFSA had no contract concerning Mr. Enomoto's Space Flight. Mr. Krasnov stated that RFSA and Space Adventures were at that time "working to conclude the agreements necessary for the implementation of such flight."

16

85. Mr. Enomoto made the Second Payment on or around August 2, 2005. As of August 2, 2005, Mr. Enomoto had paid a total $8,000,000 to Space Adventures pursuant to §§5.02.01 and 5.02.02 of the Agreement.

86. On August 4, 2005, Mr. Enomoto communicated to Mr. Anderson that the $6,000,000 payment would be available to Space Adventures on August 5, and asked Mr. Anderson to therefore confirm his flight date, as well as his participation in an EVA program with RFSA.

87. Mr. Enomoto received no response to his August 4, 2005 request.

88. On or around August 24, 2005, a plastic surgeon in Tokyo removed a tumor from Mr. Enomoto's neck and confirmed that it was a venous hemangioma.

89. Between August 29 and September 4, 2005, Mr. Enomoto was hospitalized at Nagoya City Medical College Hospital for a kidney stone exam, pursuant to the GMK's July 1 recommendations. A renal CT scan allegedly revealed the presence of multiple stones, none of which were amenable to lithotripsy therapy. Consequently, lithotripsy therapy was not recommended or provided to Mr. Enomoto following the August/September examinations.

90. According to the ISS medical standards, the presence of kidney stones, as revealed in the CT scan of August/September 2005, precluded certification of Mr. Enomoto as a candidate for space flight.

91. Upon information and belief, as of September 4, 2005, the GMK and Space Adventures knew or should have known that the presence of multiple kidney stones precluded Mr. Enomoto's certification for space flight under ISS medical standards in place at that time.

92. Upon information and belief, Space Adventures knew or should have known that without lithotripsy, it was highly unlikely that Mr. Enomoto would be "stone free" as recommended by a physician on behalf of Space Adventures following the prescreen of November 29-December 1, 2004.

93. On August 30, 2005, Space Adventures and RFSA signed an "Agreement on Preliminary Authorization to Proceed" ("PATP"), allegedly governing the Space Flight to be provided to Mr. Enomoto by RFSA or Space Adventures.

94. Upon information and belief, the PATP represented the first contractual relationship between Space Adventures and RFSA regarding Mr. Enomoto's Space Flight.

95. The PATP stated that RFSA and Space Adventures (the "PATP Parties") had entered into negotiations "aiming at the conclusion of a Contract ('Contract') on a space mission to the Russian segment of the International Space Station for a spaceflight participant – citizen of Japan, Mr. Enomoto." The PATP further provided that "the Contract concerning Mr. Enomoto shall be signed not later than November 30, 2005." (emphases added).

96. Upon information and belief, the PATP Parties never executed a contract as contemplated by the PATP.

97. On September 12, 2005, Mr. Enomoto responded to a Space Adventures e-mail that detailed plans for a joint press conference, at which Space Adventures intended to announce Mr. Enomoto's appointment as a Vice President at Space Adventures. Mr. Enomoto rejected the idea, replying that being named "Vice President at SA is too early . . . I may say 'I am also intresting (sic) to start space bussiness (sic) after I back (sic).'"

98.     Space Adventures nonetheless continued to pursue Mr. Enomoto as a Space Adventures investor in early October, 2005, when Mr. Enomoto met with Mr. Anderson in Dubai to discuss the possibility of constructing a space port in Dubai with a United Arab Emirates Sheik.

99.     Despite having no contract with RFSA providing for Mr. Enomoto's Space Flight, nor having any final agreement governing the EVA, Mr. Anderson continued to pressure Mr. Enomoto into making EVA payments.

100.    On October 6, 2005, Mr. Anderson sent Mr. Enomoto an e-mail purporting to "confirm [their] conversation" regarding an EVA Addendum to the Agreement.

101.    In his October 6, 2005 e-mail, Mr. Anderson stated that Mr. Enomoto had allegedly agreed to pay $10,000,000 for EVA, with an upfront, $5,000,000 payment within 30 days.

102.    In his October 6, 2005 e-mail, Mr. Anderson also stated that Mr. Enomoto had allegedly agreed that Space Adventures would inform RFSA that Mr. Enomoto "agree[d] to proceed with the EVA activities."

103.    In his October 6, 2005 e-mail, Mr. Anderson concluded: "If everything in here reflects your understanding, please reply to this e-mail with an affirmative response. We will proceed in good faith on the basis above until this is later superseded by a written addendum to the space flight contract."

104.    Mr. Enomoto replied to Mr. Anderson's October 6 e-mail on October 24, 2005: "YES, but I need to think about payment."

105. Mr. Anderson recognized that Mr. Enomoto had rejected the payment term he had proposed on October 6, 2005, by requesting that Mr. Enomoto send Mr. Anderson a payment proposal.

106. Mr. Anderson continued to pressure Mr. Enomoto to sign an addendum to the Agreement and to make payments toward the EVA project. On October 24, 2005, Mr. Anderson told Mr. Enomoto: "We need to sign the addendum very soon, but more importantly I do need to get the next payment by the end of this month."

107. In his communication of October 24, 2005, Mr. Anderson added that "EVA is no easy thing, we will do it but I do not want to pull the chains of the Russians. I have told them you will pay by end of October 1st payment for it (your own words!)."

108. In response to a request from Mr. Enomoto, on October 26, 2005, Mr. Anderson sent Mr. Enomoto a payment schedule detailing payments allegedly due from that time until the planned launch of his Space Flight.

109. Mr. Anderson pressured Mr. Enomoto to agree to this schedule, even while acknowledging the absence of a written EVA agreement, by reminding Mr. Enomoto "we need to get this EVA schedule agreed as soon as possible."

110. On October 31, 2005, without having executed a written agreement concerning EVA, Mr. Anderson sent Mr. Enomoto an invoice for "the next payment, due today Oct 31st as we agreed in the beginning of October." The invoice was for $5,000,000 for the "First Installment payment – EVA Activation," and Mr. Anderson noted: "We and the Russians have already spent many costs associated with EVA please pay immediately."

111.    Mr. Enomoto replied on November 1, 2005, demonstrating his confusion and his belief that no contract for EVA existed. Mr. Enomoto stated: "I am confusing (sic) what this invoice is for . . . I still haven't sign (sic) any contract of (sic) EVA."

112.    Mr. Anderson then replied to Mr. Enomoto's e-mail of November 1, 2005, by alleging, "You told me that you wanted to do the EVA many times, and you agreed on the terms (and we relied on your agreement) which is why we organized everything so far."

113.    Mr. Enomoto responded, reiterating his interest but also emphasizing that the Parties had no agreement at that time: "YES!! I want to do EVA but so far there is no detail information about it . . . . I need to know more about EVA."

114.    Mr. Enomoto refused to pay the $5,000,000 as billed on the October 31, 2005 invoice because he had not signed an EVA addendum, but instead paid $4,000,000 to Space Adventures on November 14, 2005.

115.    Mr. Enomoto made the November 14, 2005 payment because Mr. Anderson told Mr. Enomoto that a $4,000,000 EVA payment was necessary as a deposit for Space Adventures to be able to negotiate with RFSA. Mr. Anderson's statement made clear that RFSA had not yet in fact committed to providing an EVA to Mr. Enomoto at all.

116.    As of November 14, 2005, Mr. Enomoto had paid a total $12,000,000 to Space Adventures - $8,000,000 in payments pursuant to §§5.02.01 and 5.02.02 of the Agreement and $4,000,000 pursuant to Mr. Anderson's request for an EVA deposit.

117.    In November 2005, Mr. Enomoto discussed EVA and the fact that he had not yet agreed to the terms of an EVA agreement with Mr. Anderson over the phone.

21

118.    During the November 2005 phone conversation, Space Adventures unilaterally dictated to Mr. Enomoto, after Mr. Enomoto had already paid $4,000,000, that $2,000,000 of the $4,000,000 he had paid would be a non-refundable payment toward EVA, despite having no contractual authority to so designate those funds.

119.    Although Space Adventures had collected $12,000,000 from Mr. Enomoto under the Agreement by November of 2005, upon information and belief, Space Adventures had yet to execute a contract with RFSA for Mr. Enomoto's Space Flight and EVA as of that time.

120.    On November 29, 2005, Space Adventures and RFSA signed an Addendum to the PATP ("PATP Addendum"). The PATP Addendum represented that the PATP parties were still in negotiations "aiming at the conclusion of a Contract."

121.    The PATP Addendum differed from the PATP in that the PATP Addendum stated that Mr. Enomoto's Space Flight had been scheduled for October-November of 2006, and that the PATP parties agreed that "the Contract concerning Mr. Enomoto shall be signed n[o] later than February 17, 2006."

122.    On or around December 14, 2005, Ms. McCarthy e-mailed Mr. Enomoto regarding the scheduled start date for his training. Ms. McCarthy noted that "seemingly there will be a review of the medical," despite the fact that the GMK had already approved Mr. Enomoto as an intended space flight participant.

123.    In January of 2006, Mr. Enomoto began training for the Space Flight in Star City, Moscow, Russia.

124.    In early 2006, Space Adventures grew more insistent that Mr. Enomoto make

payments under the Agreement and, in particular, for EVA.

125.    On February 6, 2006, Space Adventures's Chief Financial Officer, Matt Jones, sent Mr. Enomoto an invoice for the $6,000,000 payment due upon commencement of the Space Flight Training, pursuant to §5.02.03 of the Agreement, noting that his payment was past due and urgently needed. Mr. Enomoto then e-mailed Mr. Anderson to say that he would like to discuss the payment.

126.    On February 7, 2006, Mr. Anderson sent Mr. Enomoto an e-mail stating that he had been trying to reach Mr. Enomoto with no luck and reminding Mr. Enomoto: "We need to get your payment immediately."

127.    On February 16, 2006, Space Adventures announced a joint venture with Ms. Ansari's company and RFSA to develop a fleet of suborbital spaceflight vehicles for space tourism.

128.    The next day, Space Adventures announced a $265,000,000 development project, which, upon information and belief, included Ms. Ansari as a major investor.

129.    On February 24, 2006, Mr. Anderson confirmed that he received $9,000,000 from Mr. Enomoto. Mr. Enomoto paid $6,000,000 pursuant to §5.02.03 of the Agreement, which required payment to be made upon commencement of the Space Flight training. The additional $3,000,000 was included as an EVA payment. Therefore, as of February 24, 2006, Mr. Enomoto had paid Space Adventures a total $21,000,000 - $14,000,000 in payments toward the Space Flight, pursuant to §§5.01.01, 5.01.02, and 5.01.03 of the Agreement, and $7,000,000 in payments toward EVA.

130. In late February, 2006, Space Adventures asked a kidney specialist at Ayase Station Kidney clinic who previously confirmed the presence of stones in Mr. Enomoto's kidneys, to support Mr. Enomoto's Space Flight. The specialist agreed.

131. Sensing Mr. Enomoto's increasing discomfort with the Parties' relationship, Space Adventures again tried to bind Mr. Enomoto to an EVA Addendum ("Addendum II") on March 27, 2006.

132. Mr. Anderson sent Addendum II to Mr. Enomoto and acknowledged that the Parties had still failed to execute a written agreement concerning EVA at the time: "We need to discuss the attached final agreement draft . . . [a]s you know, we have relied on our conversations in November and various e-mails to start the process of implementation for your potential EVA but this week we absolutely need to sign and agree on the final and definitive contract . . . for the terms and conditions of potential implementation of the EVA for your mission . . . we must have this done if you are to have a chance to undertake EVA on your mission."

133. Addendum II, like Addendum I, left the provision of EVA to the complete discretion of RFSA, such that RFSA could refuse to provide EVA "for any reason" and "at any time, even during the Space Flight." Addendum II §3.03.05.

134. Addendum II also included a provision that was unrelated to EVA, but which would have allowed Mr. Enomoto to be disqualified for medical reasons under the Agreement if Addendum II had been signed. Addendum II provided that Agreement §3.03 (Provision of the Space Flight) would be replaced in part with the language: "If the Client successfully completes the Space Flight Training and has not been medically disqualified, SA shall provide the Client a

24

flight into space." Addendum II §3.03 (the "Medical Disqualification Provision") (emphasis added).

135.     Upon information and belief, Space Adventures's attempt to add the Medical Disqualification Provision, by addendum, as a term of the original Agreement, was a vehicle by which to ensure that all monies already paid under the Agreement would be non-refundable if Mr. Enomoto was ultimately disqualified from space flight for medical reasons.

136.     Addendum II also attempted to include, again for the first time, a provision ensuring that Mr. Enomoto would be unable to recover any portion of his multi-million dollar EVA payment, even if he never received a Space Flight: "For the avoidance of doubt, failure to provide EVA for any reason shall in no case entitle the Client to a refund of any type under this agreement, even if the failure to provide EVA causes or contributes to a failure to provide the Space Flight Experience which would otherwise result in a refund; no refund of any part of the Space Flight Experience Price shall be made to the Client due to any failure to provide any part of the Space Flight Experience that is derived from the Russian Parties' discretion in not providing an EVA or the Client's unsuccessful attempt to pass through EVA-related training, medical examinations and flight." Addendum II §5.03 (the "Non-Refund Provision") (emphasis added).

137.     Upon information and belief, Space Adventures attempted to bind Mr. Enomoto to the Non-Refund Provision because, despite Space Adventures having promised Mr. Enomoto that it could perform on EVA, RFSA had not committed to Space Adventures that it would in fact provide EVA to Mr. Enomoto.

138.     On April 22, 2006, Space Adventures sent a revised EVA Addendum ("Addendum III") to a representative for Mr. Enomoto, which Space Adventures claimed to incorporate "best efforts" language, but which actually offered very little additional security for Mr. Enomoto, still leaving RFSA with complete discretion.  The "best efforts" clause provided:

> a.     "If the Client successfully completes EVA training and is approved for EVA, SA shall use its best efforts to see that EVA is included in the Space Flight; provided, however, that the ultimate determination of that issue is in the sole discretion of the Russian parties.  The Client understands that authorization for EVA, even though initially granted by the Russian parties, may be withdrawn at any time, even during the Space Flight, for any reason, at the complete discretion of the Russian parties."

139.     Space Adventures also stated in its April 22, 2006 e-mail that Space Adventures had "carefully considered" the "request for some sort of refund provision relating to the EVA payments.  Our conclusion is that we cannot agree to such a provision . . . provision of EVA for a private citizen is a ground-breaking effort; neither the Russians nor SA has been down this path before.  If the attached draft is satisfactory, we really need to have Dice-K sign ASAP so that we can begin the first steps."

140.     On April 22, 2006, Space Adventures explained that it would allegedly be required to pay the Russians in full for the additional time, effort, and cost created by the EVA project.  Space Adventures reiterated that "Dice-K must be willing to pay [Space Adventures], without refund, if he wishes to pursue this endeavor."

141.     Mr. Enomoto refused to sign Addendum III, which offered no assurance that he would be able to participate in EVA even if he made the full $10,000,000 payment, but which instead confirmed that RFSA would ultimately have complete discretion to disqualify him, despite Space Adventures's representation that EVA would be possible.

142.     On May 10, 2006, Mr. Enomoto was administered another renal CT scan by a physician at Nagoya City Hospital in Japan. That CT scan revealed the presence of multiple kidney stones.

143.     On May 17, 2006, a representative for Mr. Enomoto informed Space Adventures that he had decided not to participate in the EVA program.

144.     Mr. Anderson allegedly sent a letter to Mr. Krasnov (Chief of the Manned Spaceflight Department of RFSA), also on May 17, relaying Mr. Enomoto's decision.

145.     After Mr. Enomoto declined to participate in EVA, Space Adventures refused to refund any of the $7,000,000 Mr. Enomoto had paid Space Adventures for EVA and became aggressive with Mr. Enomoto, for the first time, regarding alleged concerns with his medical progress and training compliance.

146.     On May 17, 2006, Ms. McCarthy communicated to Mr. Enomoto that, despite his never having agreed to a non-refundable EVA payment schedule, a "[s]ignificant amount of the [EVA] deposit will not be refundable."

147.     Ms. McCarthy also communicated to Mr. Enomoto on May 17 that he would "[n]eed to treat the kidney calcifications/stones aggressively," and that "[a]dditional testing/treatment maybe (sic) required in the US."

148. On May 24, 2006 Mr. Enomoto contacted Ms. McCarthy, expressing his frustration at Space Adventures's refusal to refund the EVA payments and its suggested solution that the money be applied to an investment in Space Adventures. Mr. Enomoto stated: "I do not know if you are aware of this, Akane, but SA's lawyer told my lawyer that the EVA deposit, 7M cannot be refunded. They also proposed [to use the money to invest in] the next flight? Or as another investment in SA? I want Eric to explain the situation to me, so please tell him to contact me as soon as possible."

149. Ms. McCarthy replied on May 25, 2006 that she had no explanation, but that she needed to talk to Mr. Enomoto "urgently regarding [his] medical."

150. Mr. Anderson and Mr. Enomoto had a telephone conversation on or around May 26, 2006, regarding the EVA payment dispute. During that conversation, Mr. Anderson refused to answer Mr. Enomoto's question regarding whether Space Adventures would refund his EVA deposit, but reiterated that EVA research was very expensive and that, if Mr. Enomoto wanted to go to space, he should listen to Mr. Anderson.

151. On May 26, 2006, Mr. Anderson warned Mr. Enomoto not to leave his training program and urged him to continue to perform under the Agreement. Mr. Anderson threatened: "If you want to fly in space, like you said, you need to stay in training. Do not leave. You are dangerously close to being disqualified for medical reasons because you have not followed the medical recommendations for kidney stones and other issues – they have gotten worse . . . As you said, the EVA is a separate issue from your space flight. Let's let [Mr. Enomoto's Counsel] and [Space Adventures's Counsel] deal with the EVA issue."

152. On or about May of 2006, Mr. Enomoto brought to Moscow certain of his personal valuables with the intention of including them as payload on his Space Flight. (the "Personal Valuables").

153. On June 2, 2006, Space Adventures announced that Mr. Enomoto had completed his training.

154. On or around June 7, 2006, Space Adventures announced that Mr. Enomoto was confirmed as a candidate for space flight.

155. In the same press release, on or around June 7, 2006, Space Adventures announced that Ms. Ansari was named a participant in the backup crew for Mr. Enomoto's Space Flight. The press release announcing Ms. Ansari's position highlighted that she would be the "world's first female spaceflight participant, if required."

156. Upon information and belief, Space Adventures had never previously issued a press release announcing that Ms. Ansari had begun the training program, or that she might be considered as a "backup" to Mr. Enomoto in the event his Space Flight fell through.

157. Upon information and belief, Space Adventures had not yet announced the opportunity for space flight candidates to train as back-up crew members. Yet, upon information and belief, Ms. Ansari had been given this opportunity in early 2006, sometime after consummating her business arrangements with Space Adventures.

158. Upon information and belief, Ms. Ansari was the only private astronaut to have trained as a "backup" at the time.

159. An article appearing on the website "www.space.com" on June 7, 2006, stated: "[Eric] Anderson said that it's also possible that Ansari will fly on a future mission even if Enomoto makes his flight." (emphasis added).

160. Upon information and belief, there existed no explanation on June 7, 2006 for Mr. Anderson's qualification – "even if Enomoto makes his flight" – other than that Space Adventures was preparing for the possibility of disqualifying Mr. Enomoto, even as it simultaneously announced his confirmation for the Space Flight.

161. On or around June 7, 2006, Mr. Enomoto left training in Moscow for another Space Adventures-required medical examination in the United States. During this examination, another renal CT scan was performed.

162. Mr. Enomoto's June, 2006 renal CT scan was reviewed by a CT scan expert, who allegedly found the scan showed four kidney stones, all of which were allegedly smaller than 3 mm and had allegedly improved since prior scans.

163. A urologist, working, upon information and belief, on behalf of Space Adventures, also reviewed the scan and opined that the "calculi are very small and probably in the renal parenchyma. If that is correct, the likelihood of their moving and causing problems is very small."

164. Mr. Enomoto and Mr. Anderson met in Moscow on or around June 13, 2006. At this meeting, Mr. Anderson assured Mr. Enomoto that he would be able to go to space and again raised the topic of Mr. Enomoto investing in Space Adventures.

165.     Following Mr. Enomoto's June medical examination and his meeting with Mr. Anderson, Mr. Enomoto was under the impression that there were no problems with his training or medical progress.

166.     Mr. Krasnov allegedly sent a letter to Mr. Anderson on June 19, 2006, claiming that RFSA was "very surprised to hear" that Mr. Enomoto would not participate in the EVA program. Mr. Krasnov claimed that RFSA had expended great effort and time under its "PATP and Flight Contract" with Space Adventures to enable Mr. Enomoto to participate in EVA. Upon information and belief, the alleged "Flight Contract" between Space Adventures and RFSA does not exist.

167.     Mr. Krasnov also noted in his alleged June 19, 2006 letter, despite Mr. Anderson's representations to Mr. Enomoto less than a week earlier, that RFSA had "serious concerns regarding [Mr. Enomoto's] failure to follow the medical recommendations made to him by [RFSA] doctors. Approval of his participation in EVA for any future flight (other than autumn 2006) would be strictly contingent upon his completion of training, his medical status, the required financial commitment, program restrictions and other factors."

168.     Upon information and belief, Mr. Krasnov's letter of June 19, 2006, was fabricated by Space Adventures and RFSA. Upon information and belief, by June 19, 2006, both Space Adventures and RFSA were motivated to create the impression that Mr. Enomoto's medical condition had worsened since the time Mr. Enomoto had expressed that he no longer wished to do an EVA: Space Adventures owed RFSA payment for Mr. Enomoto's planned Space Flight and, if Mr. Enomoto continued to refuse to pay allegedly owed sums that Space Adventures could use to satisfy its debt to RFSA, upon information and belief, Space Adventures

and RFSA knew that the sums would be recoverable from Ms. Ansari. Upon information and belief, Space Adventures and RFSA knew that recovering that sum from Ms. Ansari was only a viable plan to the extent that Space Adventures could advance a seemingly legitimate justification, such as Mr. Enomoto's deteriorating medical condition, for relieving itself of its obligations to Mr. Enomoto under the Agreement.

169.     On June 21, 2006, Space Adventures communicated with a representative for Mr. Enomoto and raised several issues requiring "immediate attention" if Mr. Enomoto still intended to participate in the Space Flight.

170.     In the June 21, 2006 e-mail, Space Adventures raised the issue of Mr. Enomoto signing "Appendix 9," a "'legally binding document directly with and for RFSA confirming the Client's undertaking to be bound by the provisions of Article 4 and other related provisions required by RFSA in connection with the Space Flight Experience.'" Upon information and belief, Space Adventures first presented this document to Mr. Enomoto a week prior to the June 21 e-mail, despite the fact that this requirement had been included in the original Agreement, which had been executed approximately a year and a half earlier.

171.     Appendix 9 purported to establish a contractual relationship between Mr. Enomoto and RFSA. Appendix 9 also purported to establish a contractual relationship between RFSA and an already-selected "backup" space flight participant, Anousheh Ansari.

172.     Upon information and belief, it would have been unnecessary to execute a separate agreement with RFSA if Space Adventures in fact had the actual authority to enter into the Agreement with Mr. Enomoto.

173.     Space Adventures's June 21, 2006 e-mail, contrary to Mr. Anderson's representations to Mr. Enomoto one week earlier, also alleged that Space Adventures "continue[s] to receive disquieting reports from RFSA that Mr. Enomoto fails or refuses to follow various recommendations of the medical team that is monitoring his health for the flight. Scrupulous adherence to these recommendations is essential if he is to receive final clearance to fly."

174.     Upon information and belief, Space Adventures's representations that it had "continue[d] to receive disquieting reports from RFSA" were fabricated in order to stage a pretense for disqualifying Mr. Enomoto from the Space Flight in the event Mr. Enomoto could not be persuaded to pay an additional $7,000,000.

175.     On or around June 29, 2006, the MSMB certified Mr. Enomoto as medically fit for space flight to the ISS.

176.     Upon information and belief, the MSMB is a group of five physicians, one from each ISS partner agency, including RFSA and NASA, which has the final authority in determining the medical certification of every space flight participant bound for the ISS.

177.     Upon information and belief, the MSMB bases its decisions regarding the medical eligibility of non-professional space flight participants on medical standards and evaluation requirements developed by the ISS partners.

178.     Upon information and belief, the MSMB considers waivers against its medical standards through formal requests demonstrating the negligible effect of deviating from the certification standards as to a particular space flight participant.

179. Upon information and belief, a waiver request was submitted for Mr. Enomoto, including the results of his various medical examinations, and Mr. Enomoto was subsequently certified by the MSMB, demonstrating Mr. Enomoto's allegedly space-ready medical condition as of June 29, 2006.

180. On July 14, 2006, Space Adventures sent a letter to a representative for Mr. Enomoto regarding its reasons for denying Mr. Enomoto a refund for the $7,000,000 he paid toward EVA. The letter reproduced excerpts of past communications between the Parties concerning EVA. Based on these communications, Space Adventures concluded that an EVA contract had been formed, which "included the essential details of the transaction, and the parties acted on the basis of that contract."

181. Space Adventures's July 14, 2006 letter set forth a "tabulation" of the costs that Space Adventures had incurred "[i]n good faith reliance on" the parties' alleged EVA agreement. Space Adventures estimated $974,000 in costs, but noted that "the tabulation is ongoing."

182. Although it failed to include an itemized estimation of employee time, Space Adventures alleged in its July 14, 2006 letter that "one could easily justify attributing $300,000 of employee time to the Enomoto EVA over the fourteen month period."

183. Space Adventures's letter concluded that the "total out of pocket costs allocable to the aborted Enomoto EVA effort probably approach $2 million."

184. Space Adventures also claimed in the July 14, 2006 letter that Space Adventures suffered "several million dollars" of lost profits, despite the recovery of lost profits being specifically excluded under the Agreement.

34

185. On July 26, 2006, Ms. McCarthy e-mailed Space Adventures's in house counsel and Mr. Anderson regarding an outstanding invoice for the travel expenses of one of the physicians in Space Adventures's employ, which Space Adventures claimed were Mr. Enomoto's responsibility.

186. The July 26, 2006 e-mail stated that if Mr. Enomoto doesn't pay, the physician "will not attend the GMK on August 8th even though his attendance was requested by the Russian doctors. That means he will not have the support from his flight surgeon at the review and it could result in his disqualification."

187. The e-mail also explained that, although the physician's consulting fee was to be paid by Space Adventures, "as SA thought it was very important for Dice-K to have a Japanese flight surgeon," Space Adventures had informed Mr. Enomoto in the first several weeks in July that he would be responsible for the doctor's travel expenses.

188. Although the Agreement was silent as to whose responsibility it would be to pay for such expenses, Space Adventures took the position that Mr. Enomoto agreed to pay the expenses because "[h]e never replied to us with any objection."

189. Upon information and belief, Space Adventures had never previously informed Mr. Enomoto of his alleged responsibility to pay the travel expenses for the physician whom Space Adventures had hired as a consultant.

190. On July 27, Space Adventures forwarded Ms. McCarthy's internal July 26, 2006 e-mail to a representative for Mr. Enomoto, warning that Mr. Enomoto should pay the invoice because "[t]here is a fully-trained backup candidate ready to fill Dice-K's seat on the September

launch, and the Russians will not hesitate to make that substitution if they find reason to disqualify him."

191.    On the same day, July 27, 2006, Space Adventures publicly announced that Mr. Enomoto had completed zero-gravity training.

192.    In or about late July 2006, Mr. Enomoto received his final medical examinations at the Institute for Biomedical Problems (the "IBMP") in Moscow.

193.    Also in or about late July 2006, Mr. Enomoto gave his Personal Valuables to Space Adventures for inclusion in payload of the Space Flight.

194.    The Personal Valuables have never been returned to Mr. Enomoto despite his never having received the Space Flight.

195.    Upon information and belief, Space Adventures remains in possession of the Personal Valuables.

196.    On July 21, 2006, Space Adventures issued a press release announcing that it would begin offering EVA to private space tourists for $15,000,000.

197.    On July 21 and July 22, 2006, at least six news agencies reported on Space Adventure's July 21 announcement.

198.    In an article dated July 21, 2006, the New York Times reported Mr. Anderson's claim that EVA for private tourists had "been approved by the [RFSA]." Mr. Krasnov, however, speaking on behalf of RFSA, tempered its approval, stating that tourists "could potentially perform an EVA." (emphasis added).