199.    In the July 21 New York Times article, however, a NASA spokesperson stated that "the agency had not been informed by Russia about any intention to sell EVA's."

200.    The July 21, 2006 statement by NASA was echoed in several other news reports concerning Space Adventures's press release offering EVA.

201.    Also on July 21, the Washington Post reported: "The [EVA] plan still needs the approval of the other 15 partners in the International Space Station[,] including NASA."

202.    That an EVA for a private space tourist must be approved by sixteen ISS partners precluded Space Adventures from promising EVA to Mr. Enomoto as of July 21, 2006 or at any time prior to that date, including May 17, 2005, the date that Mr. Anderson informed Mr. Enomoto that an EVA would be possible.

203.    Upon information and belief, Space Adventures could not have facilitated the approval of all sixteen ISS partners prior to Mr. Enomoto's scheduled launch date of September, 2006.

204.    As of August 4, 2006, Space Adventures took the position that Mr. Enomoto still needed to pay $6,000,000 in order to participate in the Space Flight, despite the fact that he had already paid Space Adventures $21,000,000 on a $20,000,000 contract.

205.    Upon information and belief, Space Adventures understood, as of August 4, 2006, that Mr. Enomoto believed that his $7,000,000 payment toward EVA should be considered to cover this final required payment under the original Agreement.

206.    Upon information and belief, as of August 4, 2006, Space Adventures was indebted or soon to be indebted to RFSA for approximately $6,000,000.

207.    Between August 5 and August 8, 2006, the GMK convened and cleared Mr. Enomoto for space flight following his final medical evaluation.

208.    On August 9, 2006, Ms. McCarthy e-mailed Mr. Enomoto congratulating him on "passing GMK today!"

209.    One day later, on August 10, 2006, Space Adventures announced that another space flight candidate, Charles Simonyi, had passed his medical review.

210.    Upon information and belief, having committed the fourth of its four Seats to Mr. Simonyi, Space Adventures had no further Seats to commit to private space tourists.

211.    On or around August 11, 2006, Mr. Enomoto attended a dinner with Space Adventures's Vice President in Russia, Mr. Kostenko.  During this dinner, Mr. Kostenko instructed Mr. Enomoto to make the final $6,000,000 payment under the Agreement.

212.    In response to Mr. Kostenko's instruction at the August 11 dinner, Mr. Enomoto explained the recent conflict between him and Space Adventures, and his position that Space Adventures should simply credit the $7,000,000 he paid toward the aborted EVA.  Although a Space Adventures employee, Mr. Kostenko communicated to Mr. Enomoto that he was not previously aware of Mr. Enomoto's $7,000,000 EVA payment.  Mr. Kostenko responded that, in any event, Space Adventures likely would not make the final payment to the Russians for Mr. Enomoto's Space Flight.  Mr. Enomoto responded to Mr. Kostenko that he had no intention of making the final payment.

213.    Upon information and belief, following Mr. Enomoto's dinner with Mr. Kostenko, Space Adventures made a business decision, in order to satisfy a debt owed to RFSA, to facilitate the disqualification of Mr. Enomoto, so as to open his Seat on the September 2006 Space Flight to Ms. Ansari, who Space Adventures knew was ready, willing, and able to pay Space Adventures $8,000,000 for the Seat and to make a further investment in Space Adventures that Mr. Enomoto was pressured to, but ultimately declined to make.

214.    Following his dinner with Mr. Kostenko, and despite already having been cleared for Space Flight by both the MSMB and the GMK, between August 18 and 21, 2006, RFSA forced Mr. Enomoto to undergo additional renal CT and urine examinations.

215.    The results of these unexpected additional tests in August 2006 allegedly showed Mr. Enomoto's kidney stones to be larger and more numerous than they had appeared to be in his previous examinations.  These tests also allegedly revealed that Mr. Enomoto had developed chronic cystitis.

216.    Despite numerous requests, neither Mr. Enomoto nor his physicians have ever been provided a copy of the August 2006 renal CT scan or of any documentary results of that examination.

217.    On August 22, 2006, Mr. Anderson communicated to Mr. Enomoto that his September Space Flight, which was to take place in less than a month, was cancelled due to the results of this unexpected medical check-up.

218.    Mr. Anderson attached a copy of the letter disqualifying Mr. Enomoto from his scheduled Space Flight, allegedly written by RFSA (the "Rejection Letter") to his August 22, 2006 e-mail.

219.    The Rejection Letter stated: "[D]ue to recent changes in the health condition of Mr. Enomoto Daisuke . . . and on the basis of the GMK decision dated August 21, 2006, Mr. Enomoto is disqualified to fly to space and temporarily disqualified to attend the special training. Mr. Enomoto Daisuke has certain changes in his medical condition that require medical attention/treatment.  We consider that medical risks during the spaceflight could exceed the acceptable standards, taking into account the known chronic diseases that Mr. Enomoto has."

220.    The Rejection Letter failed to identify any specific medical change or condition that justified disqualifying Mr. Enomoto, whose condition had been certified by the GMK to be suitable for Space Flight only two weeks earlier.

221.    Mr. Anderson's communication of August 22, 2006 represented the first time that Space Adventures formally notified Mr. Enomoto of his disqualification from the Space Flight, and thus of Space Adventures's intention not to perform under the Agreement.

222.    A Space Adventures doctor e-mailed Mr. Enomoto's personal physician, Mr. Anderson, and Ms. McCarthy on August 22, 2006, to express his surprise that "the Russians have removed Daisuke from flight without any further discussions or any chance to react positively to any discrepancies."

223.    The Space Adventures doctor's August 22, 2006 e-mail stated in response that they had included Mr. Enomoto's renal CT scan results in a waiver request to the MSMB so that Mr. Enomoto would be approved by the MSMB, which the doctor noted "was not easy."

224.    The Space Adventures doctor explained that the second reason for including the CT scan was "to complete the study with enough time (4 weeks) before the flight to clean up any discrepancies before [Mr. Enomoto] went to Baikonur around 2 weeks before the flight." Upon information and belief, the Baikonur Cosmodrome is the space launch facility located in Baikonur, Kazakhstan, and managed by RFSA, which was the planned launch site for Mr. Enomoto's Space Flight.

225.    On August 22, 2006, the Space Adventures doctor sent another e-mail to Mr. Enomoto's personal physician, again expressing his confusion at the decision to disqualify Mr. Enomoto, and noting several additional options. The Space Adventures doctor stated: "I still think we should be an advocate for him since he had a known 3 mm linear stone for a long time that multiple reviewers have though (sic) was in the parenchyma, but they can't be 100% sure. Also, if needed, he could have an attempt at lithotripsy since we are so far from flight or departure to Baikonur . . . hopefully we can get his discrepancies improved enough to make the Russians feel he is safe for flight."

226.    The Space Adventures doctor revealed that NASA physicians in Star City had told him that the Russian medical team had found "some problem with [Mr. Enomoto's] studies, and that he [was to] be discussed at an MSMB on Wed (sic) or Thursday morning. Apparently they did not wait for the MSMB."

227.   Mr. Enomoto made several attempts to learn the specific reasons for his disqualification in August and September of 2006.

228.   In response to Mr. Anderson's e-mail forwarding the Rejection Letter, Mr. Enomoto contacted Mr. Anderson, expressing his confusion at the sudden and unexpected disqualification: "I am of course very disappointed, as it appeared that the medical situation was improving and we were getting very close to the launch date . . . Our agreement is not really clear on this issue though, so I would appreciate it if you could confirm for me your understanding of the implications of this current situation under our contract."

229.   On August 20, 2006, two days before Mr. Enomoto was informed that his Space Flight was cancelled, Space Adventures told Ms. Ansari that she would be the next space flight participant.  Space Adventures failed to issue a press release or offer any explanation regarding Mr. Enomoto's disqualification at the time.

230.   On September 4, 2006, Mr. Enomoto e-mailed Ms. McCarthy to ask what he should do in light of the fact that he had heard no response from Mr. Anderson.

231.   Ms. McCarthy replied to Mr. Enomoto on September 5, explaining that Mr. Anderson was difficult to contact at that time because he was on a business trip.  Ms. McCarthy also informed Mr. Enomoto that the back up flight participant, Ms. Ansari, had moved to Baikonur for the launch.

232.   Upon information and belief, Space Adventures received at least $8,000,000 and an investment commitment from Ms. Ansari in exchange for providing her with the Space Flight previously reserved and paid for by Mr. Enomoto.

233.    Mr. Anderson finally replied to Mr. Enomoto's August 22nd e-mail on September 7, 2006, failing to describe his understanding of the Agreement terms as Mr. Enomoto had requested. Mr. Anderson noted, however, that the process of a potential future flight for Mr. Enomoto "cannot even be started until after Soyuz TMA-9 launch and recovery, since now the medical crews are completely pre-occupied with Anousheh's flight."

234.    Mr. Anderson also explained that if RFSA allowed Mr. Enomoto to attempt to re-qualify for a future space flight, RFSA would require additional payments, "a new plan, medical tests, procedures, recommendations, re-examination, and the like."

235.    Mr. Enomoto replied again to Mr. Anderson, asking for an explanation of his disqualification. Mr. Enomoto stated that the Space Adventures doctor with whom he had been in contact still had not received Mr. Enomoto's medical records from the Russians, including the renal CT scan results which allegedly revealed additional kidney stones, and expressed his frustration regarding the lack of communication about his disqualification: "I still don't have any official document of why they rejected me from SA. Russian doctors just told me at GMK at least I need know the reasons. I heard from [my personal physician] (sic) some of them. But there is no official things so far (sic). so (sic) please send me the reason and (sic) evidence of rejection of my training."

236.    Upon information and belief, RFSA never provided the August 2006 renal CT scan results to anyone outside RFSA.

237.    Mr. Anderson again marginalized Mr. Enomoto's concerns by replying on or around September 7, 2006, alleging that: "The GMK letter that we received is the only

43

information that I have at this time.  As I said, the medical teams are very busy with Anousheh's flight now and we can try to speak with them only afterward."

238.   Mr. Enomoto replied to Mr. Anderson's September 7, 2006 e-mail, again asking Mr. Anderson: "I understand that so you still don't know the reason for my rejection?"

239.   Almost two months later, on October 25, 2006, Mr. Anderson allegedly sent a letter to RFSA, asking for the "conditions that led to the disqualification of Mr. Enomoto," and whether and under what circumstances the GMK would consider a possible future application for re-qualification of Mr. Enomoto for a future space flight.

240.   Mr. Anderson finally contacted Mr. Enomoto to inform him of Mr. Anderson's attempt to contact RFSA concerning the reasons for Mr. Enomoto's disqualification on or around October 26, 2006, almost two months after Mr. Enomoto had sent his request for the information.

241.   On November 5, 2006, a communication allegedly authored by RFSA (the "Explanation Letter") addressed the reasons for Mr. Enomoto's August disqualification.  The explanation remained vague: "the GMK and the ISS MSNB (sic) recommended conducting a number of medical lab tests in the period of August 18-21, 2006.  The tests discovered negative changes in the health condition of [Mr. Enomoto].  Those negative changes were considered to be a result of exacerbation of the chronic disease, and, most likely, infrequent violation of the medical recommendations during the final training stage.  The spaceflight factors combined with Mr. Enomoto's chronic disease and related medical conditions, were considered to exceed the acceptable medical risks."

242.   Upon information and belief, Space Adventures assisted in the preparation of the Explanation Letter.

243.   By e-mail, Space Adventures forwarded the Explanation Letter to a representative for Mr. Enomoto on or around November 28, 2006, noting that "any future Enomoto flight will be at least two years from now," in light of RFSA's recent statement that all seats had been filled until the year 2009.

244.   Space Adventures also asked whether Mr. Enomoto would be interested in attempting to re-qualify for a space flight, and stated that Space Adventures would be "glad to assist in that endeavor upon negotiation of a new contract addressing the circumstances in which we now find ourselves."

245.   Mr. Enomoto sent a response to Space Adventures's November 28, 2006 e-mail on November 29, 2006.  Mr. Enomoto indicated that he would like to discuss Space Adventures's position that Mr. Enomoto would need to enter into a new contract to re-qualify for a space flight and asked Mr. Anderson to provide him with a "clear interpretation of its obligations under [the Agreement], in light of the current circumstances."

246.   On January 29, 2007, Mr. Enomoto sent an e-mail to Mr. Anderson, expressing his interest in working out a future space flight with Space Adventures and attempting to resolve the EVA deposit issue.  Mr. Enomoto's e-mail provided:

a.   "As you will recall, we were never able to reach agreement regarding the EVA and thus I hereby request that you provide me with a refund of EVA deposit within 30 days of receipt of

this letter . . . In the event that the EVA Deposit is not refunded
in a timely manner, I will have no choice but to pursue all
available remedies under law."

247.     Space Adventures failed to respond to Mr. Enomoto's January 29, 2007 e-mail.

248.     On April 7, 2007, Mr. Simonyi participated in a space flight. As of that date,
upon information and belief, Space Adventures's performance under the Agreement was
rendered impossible, as it no longer had a Seat, as contemplated by the Agreement, to offer to
Mr. Enomoto.

249.     As of July 31, 2008, Mr. Enomoto's medical condition is not materially different
with regard to qualification for spaceflight than it was on May 10, 2006.

250.     As of July 31, 2008, Mr. Enomoto's medical condition is not materially different
with regard to qualification for spaceflight than it was in December 2004.

251.     Upon information and belief, Mr. Enomoto's medical condition on August 22,
2006, was not materially different with regard to qualification for spaceflight than it was upon
being approved for space flight by the MSMB on June 29, 2006.

252.     Upon information and belief, Mr. Enomoto's medical condition on August 22,
2006, was not materially different with regard to qualification for spaceflight than it was upon
receiving GMK certification on August 9, 2006.

253.     Upon information and belief, no private citizen has participated in EVA since it
was offered to Mr. Enomoto.

254.   To date, Space Adventures has failed to refund Mr. Enomoto any of the
$21,000,000 remitted by Mr. Enomoto to Space Adventures. This is so despite the fact that
Space Adventures failed to satisfy its obligations under the Agreement.

255.   As a result of Space Adventures's actions, Mr. Enomoto has lost $21,000,000, as
well as expended substantial time, effort, and expense in time lost to training for the Space
Flight, negotiations with Space Adventures, and attorneys' fees. Mr. Enomoto has received no
benefit in exchange for his loss.

## CAUSES OF ACTION
### COUNT I
### BREACHES OF CONTRACT UNDER VIRGINIA LAW

256.   Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5
through 255 as if fully set forth herein.

257.   On or about November 3, 2004, Mr. Enomoto entered into and executed the
Agreement in writing with Space Adventures. The Agreement created a binding legal obligation
between the Parties.

258.   Mr. Enomoto has not breached the Agreement, and Mr. Enomoto has satisfied all
conditions precedent. Mr. Enomoto has paid Space Adventures $21,000,000, has expended great
personal time and effort in complying with medical recommendations and training standards, and
stands ready and willing to take his space flight.

259.   Space Adventures has failed and neglected to perform the Agreement, in that:
First, upon information and belief, Space Adventures was not in privity of contract with RFSA
when it entered into the Agreement.

260.   Space Adventures represented in the Agreement that it had "full capacity and

47

authority to enter into this Agreement," and that it had "reserved and owns sole and exclusive rights to provide four Space Flight Experiences . . . after having purchased such rights and seats directly from the Russian Federal Space Agency." Agreement §8.01.01 and Article I.

261. The PATP and PATP Addendum clearly stated that, although RFSA and Space Adventures had entered into negotiations, no contract had been signed regarding Mr. Enomoto's flight.

262. The only reference to any contract between Space Adventures and RFSA was in Mr. Krasnov's June 2006 letter to Mr. Anderson, which claimed: "Roscosmos and our subcontractors worked for many months to potentially enable Mr. Enomoto to participate in an EVA. During the past year, we spent a significant amount of time, funds, and effort to make the implementation of such a program a reality for Mr. Enomoto. Such efforts have included, but were not limited to, the works done under our PATP and Flight Contract, wherein which we addressed the technical feasibility and implementation of Mr. Enomoto's participation in the EVA." (emphasis added).

263. This alleged Flight Contract was never discussed with Mr. Enomoto, nor was a copy ever given to Mr. Enomoto or his counsel. Upon information and belief, this contract does not exist. Space Adventures's representation that it had the authority to enter into a contract promising performance on behalf of RFSA therefore constitutes a breach of the Agreement.

264. Space Adventures also breached the Agreement because it failed to provide Mr. Enomoto with a Space Flight. Sections 3.01 and 3.03 of the Agreement bound Space Adventures to "provide the Client with an orbital space flight." Mr. Enomoto was required to comply with medical recommendations, complete required training, and pay $20,000,000. Mr. Enomoto has paid Space Adventures $21,000,000 to date, complied with all medical recommendations, and

participated in the required training until he was recessed from the Space Flight.

265.  Space Adventures's failure to provide Mr. Enomoto with a Space Flight therefore constitutes a second breach of the Agreement.

266.  Space Adventures's multiple breaches of the Agreement have damaged Mr. Enomoto.  Mr. Enomoto paid Space Adventures a total $21,000,000 with the expectation that Space Adventures had the ability to offer and would provide a space flight experience.  Mr. Enomoto was denied the opportunity to participate in the Space Flight.  Therefore, as a result of Space Adventures's multiple breaches of the Agreement, Mr. Enomoto has been damaged at least in the amount of $21,000,000.

## COUNT II

## BREACHES OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER VIRGINIA LAW

267.    Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5 through 266 as if fully set forth herein.

268.  Space Adventures's failure to provide Mr. Enomoto with a Space Flight constitutes a contractual breach of the implied covenant of good faith and fair dealing.

269.    Virginia law implies a covenant of good faith and fair dealing in all contracts, wherein and whereby each contracting party covenants and agrees that it will do everything necessary to provide the consideration for which the other party has bargained, and that it will do nothing to frustrate the reasonable expectations of the other party to the contract.

270.    By virtue of its acts and omissions in failing to provide Mr. Enomoto with a Space Flight, as hereinabove set forth, Space Adventures contractually breached the implied covenant of good faith and fair dealing.

271.    In particular, Space Adventures knew or should have known as of December 2004, when only $2,000,000 of the $20,000,000 due under the Agreement had been remitted to Space Adventures, that Mr. Enomoto's medical conditions, including but not limited to the presence of kidney stones, precluded Mr. Enomoto's certification for space flight under ISS medical standards.  Space Adventures, in bad faith, never informed Mr. Enomoto of the likelihood that he would ultimately be disqualified from space flight but, instead, continued to collect $19,000,000 from Mr. Enomoto before he was disqualified from space flight for the very condition, kidney stones, that Space Adventures was first apprised of in December 2004.

272.    The acts and omissions of Space Adventures are in violation of the implied covenant of good faith and fair dealing and have caused Mr. Enomoto to suffer damages in the amount of at least $19,000,000.

## COUNT III

### ACTUAL FRAUD UNDER VIRGINIA LAW

273.    Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5 through 272 as if fully set forth herein.

274.    Space Adventures committed fraud in inducing Mr. Enomoto into entering into the Agreement by its false representation that it had the authority to enter into the Agreement.

275.    On or about November 3, 2004, Space Adventures, through Mr. Anderson, as President and CEO of Space Adventures, represented and stated to Plaintiff that it had the "full capacity and authority to enter into [the] Agreement," and that it owned "sole and exclusive rights to provide four Space Flight Experiences . . . after having purchased such rights and seats directly from the Russian Federal Space Agency."  Agreement §8.01.01 and Article 1.

276.    These statements were untrue and constituted false representations.  Upon

information and belief, Space Adventures was not in privity of contract with RFSA at the time
the Agreement was executed.

277.    Whether Space Adventures had the authority to enter into the Agreement and to
promise performance on behalf of RFSA was a material fact, upon which the Agreement was
based.

278.    These statements were known by Space Adventures to be false when Space
Adventures made them. Space Adventures's knowledge is established by, inter alia, the fact that
the PATP and PATP Addendum, both executed after the Agreement was signed, stated that
RFSA and Space Adventures had at that point entered into "negotiations," the goal of which was
to sign a contract regarding Mr. Enomoto's Space Flight. Space Adventures consequently knew,
at the time it entered into the Agreement, that Space Adventures was not in privity of contract
with RFSA. Space Adventures therefore knowingly and intentionally misrepresented that it had
the authority to enter into the Agreement and promise performance on behalf of RFSA.

279.    Space Adventures misrepresented that it had the authority to enter into the
Agreement with the intent to mislead Mr. Enomoto into believing that Space Adventures had the
ability to promise him a space flight. Space Adventures's intent is established by the fact that, as
set forth above, Space Adventures was clearly aware of the fact that there was no contractual
relationship between Space Adventures and RFSA. Despite this awareness, Space Adventures
claimed to have authority to offer a space flight as long as Mr. Enomoto continued to make
payments under the Agreement and for an EVA. As soon as Mr. Enomoto was disqualified from
space flight, and was no longer making payments to Space Adventures, Space Adventures
claimed to have no knowledge of the reasons for Mr. Enomoto's disqualification, other than
those given by RFSA. Space Adventures demonstrated its intent to deceive Mr. Enomoto into

making payments to Space Adventures when it effectively reversed its claim of authority

concerning the Space Flight after it became clear that Mr. Enomoto would not make any extra-

contractual payments.

280.   Mr. Enomoto believed the statements so made by Space Adventures to be true and

justifiably relied on them in entering into the Agreement, as well as performing under the

Agreement, such performance including making payments under the Agreement, sustaining

substantial personal expenses in travel, medical visits and procedures, and expending significant

time and effort in complying with his obligations under the Agreement.

281.   Space Adventures's fraud in the inducement of the Agreement renders the

Agreement void.

## COUNT IV

## FRAUD IN THE INDUCEMENT OF CONTINUED PERFORMANCE UNDER

## VIRGINIA LAW

282.   Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5

through 281 as if fully set forth herein.

283.   Space Adventures committed fraud in the inducement of performance under the

Agreement by (i) misrepresenting that it could provide or facilitate the provision of EVA to Mr.

Enomoto, and (ii) failing to disclose to Mr. Enomoto that his medical conditions were

disqualifying under ISS medical standards.

284.   First, Space Adventures committed fraud in the inducement of performance by

falsely and fraudulently and with intent to defraud Mr. Enomoto representing to Mr. Enomoto

that it would be possible for Mr. Enomoto to participate in EVA.

285.   Those representations were false in fact and known to be false by Space

Adventures at the time they were so made, and Space Adventures falsely misled Mr. Enomoto in order to continue to receive multi-million dollar payments from him, irrespective of Space Adventures's ability to enable Mr. Enomoto's participation in EVA.

286.    Mr. Enomoto had informed Space Adventures that he was considering not going to Space if he could not participate in EVA. With Mr. Enomoto's determination to participate in EVA clearly set forth, Space Adventures proceeded to exploit his demonstrated interest by pressuring him to make payments toward EVA.

287.    The falsity of Space Adventures's representation that it could provide an EVA to Mr. Enomoto is demonstrated by the drafts of Space Adventures's proposed Addenda to the Agreement for EVA. These Addenda provided that RFSA would have complete discretion to deny Mr. Enomoto the EVA experience, without any reason, and without offering any refund.

288.    The falsity of this representation is also demonstrated by, inter alia, NASA's public statements to the media indicating that, contrary to Space Adventures's representations to the public in the twelve to fifteen months after Space Adventures offered Mr. Enomoto EVA, NASA had not authorized the participation by private citizens in EVA, through Space Adventures or otherwise.

289.    The falsity of this representation is also demonstrated by the fact that the provision of EVA to any private space tourist requires the approval of all sixteen ISS partner agencies. Upon information and belief, Space Adventures did not have a single such approval at the time it promised EVA to Mr. Enomoto in May 2005.

290.    The falsity of this representation is also demonstrated by the fact that Space Adventures, together with RFSA, released Mr. Enomoto from his Space Flight under false pretenses and with no intention of refunding any of the funds remitted to Space Adventures by

Mr. Enomoto.  Only two weeks prior to being informed by RFSA that he would not be able to participate in the Space Flight, Mr. Enomoto was medically cleared for space travel by the GMK, having passed rigorous medical examinations administered in Houston, Texas, and Moscow, Russia by physicians from NASA, RFSA, and JAXA.  Despite several requests by Mr. Enomoto for information concerning the specific reason for his release from the Space Flight, all of which were ignored by Space Adventures for three months, no reason beyond "negative changes" in Mr. Enomoto's health have ever been provided.

291.    The falsity of this representation is also demonstrated by Space Adventures's selection of a potential replacement space flight participant, Anousheh Ansari, who trained alongside Mr. Enomoto in 2006.  Ms. Ansari participated in the Space Flight upon Mr. Enomoto's release.  Upon information and belief, Ms. Ansari paid Space Adventures at least $8,000,000 for her participation in the Space Flight.  Upon information and belief, Space Adventures, together with RFSA, released Mr. Enomoto from the Space Flight when it became clear to Space Adventures that Mr. Enomoto would not execute any of Space Adventures's proposed Addenda to the Agreement for purposes of contracting for EVA and would not pay at least $7,000,000 that Space Adventures alleged remained due under the Agreement.  Upon information and belief, Space Adventures knew in August 2006 that Mr. Enomoto was medically cleared for Space Flight but convinced RFSA to release Mr. Enomoto under the pretense of medical issues.  Upon information and belief, Space Adventures knew in August 2006, that, by releasing Mr. Enomoto from the Space Flight, it would retain the sums already paid by Mr. Enomoto and be in a position to recover at least the additional $7,000,000 as well as a separate investment in Space Adventures that it had hoped to further obtain from Mr. Enomoto in the name of EVA from Ms. Ansari.

292.    The falsity of this representation is also demonstrated by the fact that, upon information and belief, Space Adventures misrepresented a basis for relieving itself of its obligation to perform under the Agreement, when it knew that basis was false, and nonetheless held Mr. Enomoto to his payment obligations under the Agreement. Space Adventures attempted to coerce Mr. Enomoto into the paying travel expenses for a physician who had been hired as a consultant by Space Adventures. Space Adventures stated in an internal July 26, 2006 e-mail that if Mr. Enomoto did not pay for the expenses, the physician "will not attend the GMK on August 8th even though his attendance was requested by the Russian doctors. That means he will not have the support from his flight surgeon at the review and it could result in his disqualification." Space Adventures forwarded this e-mail to a representative for Mr. Enomoto on July 27, and included the additional warning that "Withholding payments necessary for the flight does not give him leverage on the EVA refund issue, but merely jeopardizes his flight," where the ability or willingness to pay bears no reasonable relationship to one's medical condition.

293.    Second, Space Adventures committed fraud in the inducement of performance by fraudulently failing to disclose the likelihood that Mr. Enomoto would be disqualified for a medical condition at all times between December 2004 and August 22, 2006.

294.    Space Adventures knew or should have known as of December 2004, when only $2,000,000 of the $20,000,000 due under the Agreement had been remitted to Space Adventures, that Mr. Enomoto's medical conditions, including but not limited to the presence of kidney stones, would preclude or very likely preclude Mr. Enomoto from receiving certification for space flight under ISS medical standards. Space Adventures, in bad faith, never informed Mr. Enomoto of the likelihood that he would ultimately be disqualified from space flight but, instead,

continued to collect $19,000,000 from Mr. Enomoto before he was disqualified from space flight for the very condition, kidney stones, that Space Adventures was apprised of in December 2004.

295.   Space Adventures knew or should have known of the disqualifying nature of Mr. Enomoto's medical condition and knew or should have known that any reasonable person would have relied upon that information in considering whether to pay $19,000,000 in exchange for a service that would likely never be performed.

296.   Space Adventures withheld information about the probability of disqualification in order to induce Mr. Enomoto's continued performance under the Agreement.

297.   Plaintiff Mr. Enomoto relied upon the representations and was thereby induced to continue to perform under the Agreement, in the form of continuing to make payments as specified in the Agreement.  Mr. Enomoto paid Space Adventures a total $21,000,000, in reliance on its representations that Mr. Enomoto was progressing in his training and moving toward being medically cleared for his Space Flight, and on which representations he was led to believe he would be able to participate in EVA.

298.   By reason of the foregoing Plaintiff Mr. Enomoto has suffered damage in the sum of at least $19,000,000.

299.   As a result of Space Adventures's multiple fraudulent misrepresentations, Mr. Enomoto has suffered actual damages in the amount of at least $21,000,000.

300.   Space Adventures's fraudulent misrepresentations also justify an award of punitive damages because the misrepresentations were not only intentional, but demonstrated actual malice and a reckless and conscious disregard of Mr. Enomoto's rights.

301.   Space Adventures's misrepresentations resulted in great profit for Space Adventures, but operated as a fraud against Mr. Enomoto.  Space Adventures retained

$21,000,000 which would not have been paid to it had Mr. Enomoto known (1) that Space

Adventures had no ability to guarantee EVA, (2) that he was likely to be disqualified from space

flight, or (3) that Space Adventures would manipulate his certification status depending upon the

availability of more financially favorable tourists to fill the two vacant seats that Space

Adventures had purchased from RFSA, regardless of Mr. Enomoto's performance under the

Agreement.  Substantial punitive damages are necessary to curb any further willful and malicious

misrepresentations intended to take advantage of unsuspecting potential Space Flight

Participants.

## COUNT V

## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT

302.    Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5

through 301 as if fully set forth herein.

303.    The aforementioned false representations made by the Defendant, Space

Adventures, also constitute a violation of the Virginia Consumer Protection Act of 1977, Va.

Code Ann. §59.1-196 et seq.

304.    Space Adventures is a "supplier" as defined by §59.1-198, in that Space

Adventures is a "seller . . . who advertises, solicits, or engages in consumer transactions."

305.    The Agreement constituted a "consumer transaction" as defined by §59.1-198, in

that the Agreement was an "advertisement, sale, lease, license or offering for sale, lease or

license, of goods or services to be used primarily for personal, family or household purposes."

The Agreement provided services as defined by §59.1-198, in that by offering to provide Mr.

Enomoto with a Space Flight, Space Adventures provided "work performed in the business or

occupation of the supplier."

306.    The subject transaction is therefore regulated by the VCPA.

307.    The aforementioned acts by Space Adventures constitute prohibitive practices within the meaning of the VCPA.  Section 59.1-200 provides that it is unlawful for a supplier to misrepresent: "goods or services as those of another," §59.1-200(1); or "the affiliation, connection, or association of the supplier, or of the goods or services, with another," VCPA §59.1-200(3).  VCPA § 59.1-200(14) further provides that it is unlawful for a supplier to use "any other deception, fraud, false pretense, false promise, or misrepresentation" in connection with a consumer transaction.

308.    Space Adventures violated the VCPA by its acts and omissions in making a fraudulent misrepresentation of fact in representing that it had the authority to enter into the Agreement and promise performance on behalf of RFSA, which statements (i) were untrue, and constituted false representations; (ii) addressed and falsely represented a material fact, upon which the Agreement was based; (iii) were known by Space Adventures to be false when Space Adventures made them; (iv) were made with the intent to mislead Mr. Enomoto into believing that Space Adventures could offer him a Space Flight; and (v) were believed to be true and justifiably relied on by Mr. Enomoto in entering into and performing under the Agreement.

309.    Mr. Enomoto repeats and realleges the allegations of actual fraud contained in paragraphs 274 through 281 as if fully set forth herein.

310.    Space Adventures also violated the VCPA by its acts and omissions in (i) falsely and fraudulently and with intent to defraud representing to Mr. Enomoto that it would be possible for Mr. Enomoto to participate in EVA; and (ii) fraudulently failing to disclose the likelihood that Mr. Enomoto would be disqualified for a medical condition that was known to Space Adventures and RFSA at all times between December 2004 and August 22, 2006.

311.   Mr. Enomoto repeats and realleges the allegations of fraudulent inducement of performance contained in paragraphs 283 through 301 as if fully set forth herein.

312.   As a direct and proximate result of Space Adventures's misconduct in violation of the VCPA, Mr. Enomoto has suffered actual damages in the amount of $21,000,000. Because Mr. Enomoto suffered actual loss, VCPA §59.1-204(A) allows Mr. Enomoto to recover his actual damages. The foregoing violations of the Virginia Consumer Protection Act were willful, and consequently support trebled damages, as contemplated under the VCPA §59.1-204(A). Pursuant to VCPA §59.1-204(B), Mr. Enomoto is also entitled to an award of reasonable attorney's fees and court costs.

**COUNT VI**

**CONVERSION UNDER VIRGINIA LAW**

313.   Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5 through 312 as if fully set forth herein.

314.   First, on or about August 22, 2006, Defendant Space Adventures converted to its own use $19,000,000, which was the property of Plaintiff Mr. Enomoto.

315.   Space Adventures wrongfully exercised authority over Mr. Enomoto's payments made under the Agreement which was in denial of, or inconsistent with, Mr. Enomoto's rights to have these payments returned to him. Section 7.03.02 of the Agreement required Space Adventures to refund "all payments not already transferred to the Russian parties, with the exception of the Contract Deposit," if Space Adventures failed to provide Mr. Enomoto with a Space Flight as agreed.

316.   Mr. Enomoto was disqualified from participating in his scheduled Space Flight in the fall of 2006. Space Adventures was, at no point later than 30 days following Mr. Enomoto's

January 29, 2007 e-mail to Mr. Anderson, required to return Mr. Enomoto's payments made under the Agreement. Space Adventures has offered no evidence that this money has been transferred, spent, or otherwise allocated such that it cannot be returned to Mr. Enomoto.

317.     Second, on or about August 22, 2006, Space Adventures converted to its own use the Personal Valuables, which were the property of Plaintiff Mr. Enomoto.

318.     Space Adventures wrongfully exercised authority over Mr. Enomoto's Personal Valuables, which was in denial of, or inconsistent with, Mr. Enomoto's ownership of the Personal Valuables. On or about late July 2006, Mr. Enomoto gave the Personal Valuables to Space Adventures for inclusion in payload of the Space Flight. The Personal Valuables have never been returned to Mr. Enomoto despite his never having received a Space Flight. Upon information and belief, Space Adventures remains in possession of the Personal Valuables.

319.     As a result of Space Adventures's unlawful conversion of Mr. Enomoto's payments and Personal Valuables, Mr. Enomoto has suffered actual damages in an amount in excess of $19,000,000.

320.     Space Adventures acted with malice and reckless disregard for Mr. Enomoto's rights by refusing to refund Mr. Enomoto's money and return his Personal Valuables upon its failure to provide the Space Flight. Substantial punitive damages are necessary to curb this malicious conduct.

## COUNT VII

### BREACH OF ORAL CONTRACT UNDER VIRGINIA LAW

321.     Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5 through 320 as if fully set forth herein.

322.     On May 17, 2005, County of Fairfax, Commonwealth of Virginia, Mr. Enomoto

and Space Adventures entered into an oral agreement under which Space Adventures, for its part, agreed to provide Mr. Enomoto with the opportunity to participate in Extra Vehicular Activities during his Space Flight.

323.    In consideration of Space Adventures's promise, Mr. Enomoto, for his part, agreed to pay $10,000,000.

324.    Mr. Enomoto has partially performed under the oral agreement, paying $7,000,000 to Space Adventures to date, and is ready, willing, and able to pay the remaining $3,000,000 as soon as Space Adventures demonstrates that it is able to perform its obligations under the Agreement.

325.    For its part, Space Adventures has failed and refused to perform its obligations under the oral agreement in that Space Adventures is unwilling or unable to offer, and in any case has not provided Mr. Enomoto the opportunity to participate in EVA in exchange for his $10,000,000 payment.

326.    Space Adventures represented to Mr. Enomoto that his participation in an EVA would be possible.  To date, Space Adventures has failed to facilitate Mr. Enomoto's participation in an EVA.  This failure constitutes a breach of Space Adventures's oral agreement with Mr. Enomoto.

327.    By reason of the breach by Space Adventures, Mr. Enomoto has sustained damages in the sum of at least $7,000,000, with interest on such sum from no later than August 22, 2006, for costs of this action, and such other and further relief as this Court deems just and proper.

## COUNT VIII

### UNJUST ENRICHMENT

328.    Mr. Enomoto repeats and realleges the allegations contained in paragraphs 5 through 327 as if fully set forth herein.

329.    Space Adventures was unjustly enriched at the expense of Mr. Enomoto when it knowingly accepted and retained payments for EVA despite never providing EVA to Mr. Enomoto.

330.    Mr. Enomoto conferred a benefit upon Space Adventures in the form of $7,000,000 based on Space Adventures's representation that it would provide him the opportunity to do EVA.  Mr. Enomoto expected performance by Space Adventures in exchange for the benefit conferred by him.

331.    Space Adventures knowingly received this benefit from Mr. Enomoto: Space Adventures accepted the $7,000,000 and has neither alleged nor proven costs incurred by Space Adventures that would support the conclusion that this money has been allocated, spent, or otherwise conferred upon any other recipient.

332.    Under the circumstances, it would be inequitable for Space Adventures to retain the benefit of the $7,000,000 it misappropriated.

333.    Space Adventures failed to facilitate Mr. Enomoto's participation in EVA, and offered him only limited EVA training in exchange for his $7,000,000 payments.

334.    Space Adventures accepted and retained Mr. Enomoto's money despite having no legal or equitable claim thereto, and despite providing no performance in exchange.  Mr. Enomoto has paid Space Adventures a total $7,000,000 towards EVA and has been denied the promised experience of participating in Extra Vehicular Activities.  Mr. Enomoto has received

no benefit in exchange for his $7,000,000 payments. Principles of equity therefore dictate that this sum be returned to Mr. Enomoto.

335.    Mr. Enomoto has no remedy at law in the event that no contract for EVA was legally formed.

### RELIEF REQUESTED

336.    WHEREFORE, Plaintiff Daisuke Enomoto respectfully requests that this Court enter judgment in his favor and against Space Adventures on the Complaint and enter an order as follows:

      a.  Awarding Mr. Enomoto damages in excess of $21,000,000, including incidental and consequential damages, according to proof at trial; and

      b.  Awarding Mr. Enomoto punitive damages in an amount such as the Court shall find to be just, according to the egregious and malicious willful conduct of Defendants; and

      c.  Awarding Mr. Enomoto treble damages, attorneys' fees, and court costs, pursuant to the VCPA, by reason of Defendant's acts of fraudulent misrepresentation.

d.  Granting such other relief as the Court deems just and proper.

Respectfully submitted,

DAISUKE ENOMOTO,

By:  _____
Peter J. Carney
Virginia State Bar #40498
WHITE & CASE LLP
701 Thirteenth St. NW
Washington, DC 20005
(202) 626-3600

Conrad M. Shumadine
Virginia State Bar #4325
Counsel for Daisuke Enomoto
WILLCOX & SAVAGE, P.C.
One Commercial Place, Suite 1800
Norfolk, VA 23510-2197
Telephone: 757.628.5500
Facsimile: 757.628.5566
cshumadine@wilsav.com

Jean Shimotake
James Trainor
Allison Dodd
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200